# IN THE COURT OF APPEALS OF IOWA

No. 16-1943
Filed January 10, 2018

**MARK ALLAN BITZAN,**
　　　　Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
　　　　Respondent-Appellee.
_____

　　　　Appeal from the Iowa District Court for Monona County, Duane E. Hoffmeyer, Judge.

　　　　Mark Bitzan appeals the denial of his application for postconviction relief. **AFFIRMED.**

　　　　James P. McGuire of McGuire Law, P.L.C., Mason City, for appellant.

　　　　Thomas J. Miller, Attorney General, and Louis S. Sloven, Assistant Attorney General, for appellee State.

　　　　Considered by Vaitheswaran, P.J., and Doyle and Bower, JJ.

**VAITHESWARAN, Presiding Judge.**

A college student on her way home for winter break stopped at a rest area in Monona County, Iowa. A man in the women's restroom accosted her, forcibly moved her to the handicapped stall, threatened her with a pocket knife, and raped her.

A jury found Mark Bitzan guilty of first-degree kidnapping.[1] This court affirmed his judgment and sentence of life in prison. *See State v. Bitzan*, No. 12-0551, 2013 WL 3273813, at *5 (Iowa Ct. App. June 26, 2013). Bitzan filed an application for postconviction relief (PCR) alleging his trial attorneys provided ineffective assistance. The district court denied the application following an evidentiary hearing. Bitzan appealed.

## I.      *Ineffective Assistance of Counsel*

Bitzan contends his trial attorneys were ineffective in failing to (A) object to a nurse's testimony vouching for the credibility of the student; (B) investigate the case and interview witnesses; (C) advise him of the consequences of his decision not to testify and prepare him to testify; (D) object to or investigate DNA evidence; (E) consult an expert about false allegations of rape; (F) object to alleged prosecutorial misconduct; (G) consult an expert about a vaginal tear sustained by the student; (H) impeach the student and explicate his defense of consensual sex; (I) challenge particular jurors for cause or exercise peremptory strikes; and (J) object to testimony about another assault. To prevail, he must show (1) counsel

---

[1] The State also charged Bitzan with second-degree sexual abuse. The jury was instructed to consider this charge only if the State failed to prove the elements of first-degree kidnapping. See State v. Mitchell, 450 N.W.2d 828, 831 (Iowa 1990) (holding second-degree sexual abuse is a lesser-included offense of first-degree kidnapping).

3

breached an essential duty and (2) prejudice resulted. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984).

### A. Vouching Testimony

The following evidence is relevant to the vouching claim. After the student was raped, she drove to a hospital, where she was examined by an emergency room nurse with twenty-five years of experience. The defense called the registered nurse as a witness to controvert the student's account of having to stop at the rest area to address stomach issues. On cross-examination, the prosecutor asked the nurse whether the student's demeanor was "consistent with" what she had seen in other women who said they were sexually assaulted. Defense counsel objected on relevancy grounds and on the ground the question was outside the scope of direct examination. The district court overruled the objection and the prosecutor proceeded with the following exchange:

> Q. Was there anything about the way she appeared that gave you cause to doubt what she was telling you? A. No.
> . . . .
> Q. Did she present in your hospital asking to be treated for a stomach ailment or because she had been sexually assaulted? A. She presented because she had been sexually assaulted.
> Q. I believe it's your testimony that nothing she did made you doubt that, correct? A. That is correct.
> Q. Nothing about her demeanor? A. Nothing about her demeanor.
> Q. Nothing about what she told you? A. Nothing about what she told me.
> Q. Nothing about how she reacted to any of the questions you asked? A. Nothing about how she reacted to the questions.
> Q. Nothing about— A. Nothing.
> Q. —anything to do with her made you doubt what she had to tell you? A. I did not doubt her at all, no.

Bitzan's attorney failed to object to this line of questioning. On redirect examination, he asked the nurse, "Your role wasn't to decide whether or not what

she said was the truth, correct?" The nurse responded, "This is true." The attorney then asked, "So that's not something that you were in a position to determine at the time?" The nurse answered, "Personally, I felt as if she was not—she was being honest."

Bitzan contends the nurse impermissibly vouched for the student's credibility and "counsel breached an essential duty by failing to object to the long series of improper questions." On our de novo review, we agree.

The nurse categorically stated nothing made her doubt the student's narrative and she believed the student was "being honest." She directly opined on the credibility of the college student, in contravention of decades old precedent. *See State v. Myers*, 382 N.W.2d 91, 95 (Iowa 1986) ("[E]xpert opinions on the truthfulness of a witness should generally be excluded because weighing the truthfulness of a witness is a matter reserved exclusively to the fact finder.").

Our courts have reaffirmed this precedent. *See State v. Brown*, 856 N.W.2d 685, 689 (Iowa 2014) (concluding sentence in physician's report "indirectly convey[ed] to the jury that [the child was] telling the truth about the alleged abuse because the authorities should conduct a further investigation into the matter"); *State v. Dudley*, 856 N.W.2d 668, 676-77 (Iowa 2014) (holding an expert's testimony is "not admissible merely to bolster a [witness's] credibility"); *State v. Jaquez*, 856 N.W.2d 663, 665 (Iowa 2014) (concluding the expert witness indirectly vouched for a child victim's credibility in stating the victim's "demeanor was completely consistent with a child who has been traumatized, particularly multiple times"); *In re C.W.*, No. 16-1677, 2017 WL 5185433, at *5 (Iowa Ct. App. Nov. 8, 2017) ("Counsel's questioning to elicit the vouching testimony was a breach of duty

to represent [the juvenile] effectively."); *Simpson v. State*, No. 15-1529, 2017 WL 1735615, at *7 (Iowa Ct. App. May 3, 2017) (concluding trial attorney breached a duty to object to coaching testimony); *State v. Tjernagel*, No. 15-1519, 2017 WL 108291, at *8 (Iowa Ct. App. Jan. 11, 2017) (concluding trial counsel breached an essential duty in failing to object to expert testimony "indirectly vouching for [a child's] credibility and truthfulness"); *State v. Pitsenbarger*, No. 14-0060, 2015 WL 1815989, at *9 (Iowa Ct. App. Apr. 22, 2015) (finding no reasonable strategy for failing to object to improper vouching testimony). In most if not all these opinions, the statements found to have been impermissible were far more indirect than the nurse's statements in this case.

The State only addresses *Brown*. In its view, the opinion is inapposite because it discussed expert credibility opinions, whereas the nurse testified as a lay witness. To the contrary, the nurse testified in her capacity as a trauma professional. Her role was no different than the forensic interviewer and therapist in *Dudley* or the physicians who examined the children in *Brown* and *Jaquez*. *See Brown*, 856 N.W.2d at 689; *Dudley*, 856 N.W.2d at 677-78; *Jaquez*, 856 N.W.2d at 664; *see also Myers*, 382 N.W.2d at 98 (finding school principal's vouching testimony impermissible); *State v. Gillison*, No. 15-2045, 2017 WL 2181176, at *3 (Iowa Ct. App. May 17, 2017) (concluding forensic interviewer and other witnesses offered "direct testimony about their belief in the credibility of the witness's allegations" and defendant's attorney "breached a duty in failing to object").

Notably, the State filed a pretrial motion in limine seeking to exclude precisely this type of vouching testimony. The district court granted the motion. The vouching testimony elicited from the nurse contravened the ruling. *See*

*Tjernagel*, 2017 WL 108291, at *7 (noting State filed a pretrial motion in limine seeking to bar "[a]ny witnesses testifying about the credibility of other witnesses"). We conclude Bitzan's attorneys breached an essential duty in failing to object to the prosecutor's questions and the nurse's responses, including the response to the defense question.

This brings us to the *Strickland* prejudice requirement. To satisfy this prong of the test, an applicant must show "a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland*, 466 U.S. at 694. This standard is not met when the evidence of guilt is overwhelming. *See State v. Ambrose*, 861 N.W.2d 550, 559 (Iowa 2015) (concluding "there was no reasonable probability the result of the trial would have been different" where "[t]he evidence of guilt was overwhelming"). In cases involving a witness who vouches for the credibility of another witness, we also have asked whether the case turned on witness credibility. *Tjernagel*, 2017 WL 108291, at *8 (finding prejudice where "the State's case . . . rested entirely on the credibility of the witnesses"); *Pitsenbarger*, 2015 WL 1815989, at *10 (concluding "the result may have been different if proper objections had been made to exclude the improper testimony" because "the State's case . . . rested entirely on the credibility of the witnesses"). And we have considered the presence or absence of physical evidence, the pervasiveness of the vouching testimony, and its emphasis in the presentation. *See Tjernagel*, 2017 WL 108291, at *7.

Our de novo review of the trial record reveals the following facts. The college student described stopping at the rest area, going to the women's restroom, seeing a pair of shoes in the handicapped stall, and having "this instant

reaction something is wrong here." Despite this trepidation, her upset stomach left her no choice but to relieve herself. She stepped into the toilet two stalls down. Soon, she heard the other person leave the handicapped stall, go towards the door, and return to the handicapped stall. She proceeded to the sink area and began washing her hands. As she did so, she glanced up at the mirror and noticed a man standing behind her.

The man wrapped his right hand around her torso and the other hand over her mouth, kissed her on the head, asked if she was going to be quiet, and, after she finished washing her hands, forced her into the handicapped stall. He closed and locked the stall door and held her against the wall. The student was "shaking uncontrollably" in "terror." She testified, "I don't know how many people in their life actually feel genuine terror, but you can't describe that sort of feeling." In a low, "creepy" voice, the man attempted to determine whether someone was waiting for her and whether she was on birth control. He pulled out a "collapsible knife" and said, "If you are quiet, I won't hurt you."

The man proceeded to hurt her. He removed her snow boots and pants, unzipped and lowered his pants, touched her labia and clitoris, forced her to lie on the floor of the stall, and inserted his penis into her vagina. He ejaculated, zipped up his pants, told her to wait in the restroom, and left.

The student left soon after. She obtained the number of her college ROTC commandant and phoned her.

The commandant testified to her conversation with the student. In her words, the student told her "she was raped." On determining the man ejaculated, the commandant advised the student not to wash herself and to get to a hospital.

A sexual assault nurse examiner at a second hospital to which the student was transferred asked her what happened. The nurse examiner recounted the student's response, as follows:

> She stopped off at a rest stop . . . approximately 50 miles, roughly, north of Council Bluffs . . . . She went into the women's restroom to use the restroom and looked underneath the stalls and saw feet underneath one of the stalls. She proceeded to use the restroom. [S]he came out and was washing her hands. She said that a man had come out of one of the stalls, came up behind her, and put his hand over her mouth and kissed the top of her head. She told me that he said not to fight her, to cooperate with . . . him. He then forced her into . . . the handicapped stall in the restroom. She told me that he pushed her up against the wall, that he kept asking her if she was going to cooperate with him. He took a pocketknife out of his pocket numerous times and showed it to her, and you know, told her that she needed to cooperate with him . . . . She just told me that . . . he had taken her pants and her boots off, that he had laid her on the floor of the stall in the restroom and that he had raped her.

The nurse examiner completed a sexual assault kit that included two swabs from the student's genital area. The department of criminal investigation tested these samples and identified an unknown male DNA profile. This profile was compared to known profiles. According to a DCI criminalist, "[I]f somebody's DNA profile matches or is identical to the profile that we obtained from the evidence," the agency issues a statistic "that says less than one in 100 billion" in the general population have that profile. Within these parameters, the criminalist opined, "The profile that was obtained from the vaginal swab and the pubic hair swab [of the student] matched the known profile of Mark Bitzan."

A DCI special agent informally spoke to the student at the hospital. According to the agent, "She stated that she had to use the restroom" and "she decided to pull over knowing that she was still 57 miles away from Council Bluffs." She provided the agent with a description of her assailant. During a formal

interview several hours later, the student provided a consistent description of the attacker.

Bitzan exercised his constitutional right not to testify. His defense of consensual sex was advanced through cross-examination of the State's witnesses and through several defense witnesses, including Bitzan's parents, a student who was asked about the consequences of providing false testimony, and the emergency room nurse whose vouching testimony is being challenged.

Even without the vouching testimony, the evidence supporting the jury's finding of guilt was overwhelming. First, the student did not waver from her narrative, even in the face of vigorous cross-examination by the defense. For example, when one of the attorneys asked, "Bottom line is that you were in this rest area, and you met this person, and for whatever reason, you allowed this to happen, is that true?" she responded, "No. I did not meet this person. This person grabbed and attacked me." Second, the DNA evidence corroborated the student's testimony. Finally, the testimony of the student's commandant, the sexual assault nurse examiner, and the DCI special agent lent credence to the student's testimony.

We recognize the prosecutor honed in on the impermissible vouching testimony in her closing argument. But given the wealth of permissible evidence corroborating the student's testimony, we are persuaded the prosecutor's comments did not generate a reasonable probability of a different outcome.

### B. Remaining Ineffective Assistance Claims

Having found the evidence of guilt overwhelming, we could conclude Bitzan's remaining ineffective assistance claims fail on the *Strickland* prejudice

prong. But because Bitzan also asserts the combined effect of these errors denied him a fair trial, we will separately address those claims. *See State v. Clay*, 824 N.W.2d 488, 500, 501-02 (Iowa 2012) (stating, "Under Iowa law, we should look to the cumulative effect of counsel's errors to determine whether the defendant satisfied the prejudice prong of the *Strickland* test," and stating, "If the defendant raises one or more claims of ineffective assistance of counsel, and the court analyzes the prejudice prong of *Strickland* without considering trial counsel's failure to perform an essential duty, the court can only dismiss the postconviction claim if the alleged errors, cumulatively, do not amount to *Strickland* prejudice").

On our de novo review, we are persuaded Bitzan's trial attorneys breached no essential duty in (B) investigating the case and interviewing witnesses; (C) advising him of the consequences of his decision not to testify and preparing him to testify; (D) failing to object to or investigate the DNA profile evidence; (E) failing to consult an expert about false allegations of rape; (F) failing to object to claimed prosecutorial misconduct; (G) failing to consult an expert to opine on the cause of the vaginal tear sustained by the student; and (H) impeaching the student and explicating the defense of consensual sex. Bitzan's primary attorney thoroughly explained his trial strategy with respect to most of these contentions. The strategy as explained was reasonable or, where it was not explained, was apparent from the trial record.

We are less sanguine about defense counsels' failure to challenge certain jurors for cause or exercise a peremptory strike. Although Bitzan challenges defense counsels' conduct with respect to several members of the jury panel, our

concern is with juror #21.[2]  The juror stated he had an existing attorney-client relationship with the part-time Monona County Attorney who, in his civil practice, was "taking care of restaurant matters" for him.

Iowa Rule of Criminal Procedure 2.18(5)(e) allows a challenge for cause to a potential juror "[s]tanding in the relation of . . . attorney and client."  Although the Monona County Attorney was not the primary prosecutor of Bitzan's case, he was listed on the State's filings and was the head of the office employing one of the prosecutors who handled the case.  Under these circumstances, defense counsel should have moved to have the juror stricken for cause.  *See, e.g.*, *Futrell v. Comm*onwealth, 471 S.W.3d 258, 274 (Ky. 2015) (stating potential juror's "close relationship with the prosecutor trying the case is presumptively disqualifying" and "any suggestion of an on-going relationship with the prosecutor, such as the potential juror's intent to make use of his professional services again, is disqualifying" and concluding district court's failure to remove a juror for cause after he acknowledged actual bias based on the attorney-client relationship was an abuse of discretion, as was the court's failure to remove a juror whose son was represented by the prosecutor); *cf. State v. Shimko*, No. 05-1758, 2006 WL 3018467, at *2 (Iowa Ct. App. Oct. 25, 2006) (noting attorney-client relationship ended a year earlier).  Their failure to make the motion constituted a breach of an essential duty.

---

[2] On our review of the reported voir dire of the remaining challenged jurors and the notes of Bitzan and his attorneys, we are persuaded counsel did not breach an essential duty in failing to challenge those jurors for cause or exercise peremptory challenges.

That said, Bitzan did not establish *Strickland* prejudice. Both he and his attorneys had notes reflecting their knowledge of the juror's relationship with the county attorney and indicating a preference to have the potential juror remain on the jury. In addition, the juror stated the relationship he had with the prosecutor would not give him pause or impact his ability to listen to a case the county attorney's office was prosecuting. *See Shimko*, 2006 WL 3018467, at \*2 (noting juror "affirmed that he could set aside his personal biases and opinions and render a verdict only on the information presented as evidence and testimony. He further opined that his past business dealings with the prosecutor would not interfere with his ability to impartially judge the evidence presented at trial").

We are left with the claimed failure of Bitzan's attorneys to object to testimony about another assault. Specifically, the DCI special agent who interviewed the student testified, "[A]pproximately a few weeks prior to this incident being reported to us, we had another reported incident in Harrison County of a possible sexual assault." According to Bitzan, the State deliberately elicited the agent's response "knowing his answer would be devastating testimony that would be highly prejudicial."

"Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." Iowa R. Evid. 5.404(b)(1). However, it may be admissible for other purposes. Iowa R. Evid. 5.404(b)(2).

At the postconviction hearing, one of Bitzan's attorneys was asked about this testimony. He had no specific recollection of it and agreed the record would speak for itself. On our de novo review, we note the DCI agent did not tie the prior

incident to Bitzan and proceeded to answer questions about the DNA of a "known local sex offender" other than Bitzan. Read in context, the challenged testimony may have been a reference to the local sex offender. We conclude counsel did not breach an essential duty in failing to object to the testimony. But if counsel had an obligation to object, the claim fails on the *Strickland* prejudice prong, given the overwhelming evidence supporting the finding of guilt.

Having found the remaining ineffective assistance claims unpersuasive, we find the claim of cumulative error unavailing.

## II. *Prosecutorial Misconduct*

Bitzan contends "the district court erred in failing to find prosecutorial misconduct." The PCR court did not rule on any independent prosecutorial misconduct claims. Accordingly, we have nothing to review. *See Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002) ("It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal.").

We affirm the denial of Bitzan's postconviction relief application.

**AFFIRMED.**