RENDERED: MAY 5, 2016
TO BE PUBLISHED

# $\mathfrak{Supreme\ Court\ of\ Kentucky}$

## 2014-SC-000306-DG

COMMONWEALTH OF KENTUCKY                    APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                    CASE NO. 2012-CA-001697
FAYETTE CIRCUIT COURT NO. 12-CR-0136

CATON KAMIL JONES                    APPELLEE

## OPINION OF THE COURT BY CHIEF JUSTICE MINTON

### REVERSING

In our popular culture, operation of a criminal syndicate is commonly associated with the underworld activities of mobsters and crime bosses. This case involves none of those things. Today we must determine whether wholesale enlistment of homeless men as tools in a scheme systematically to defraud cell-phone companies is likewise covered under Kentucky's organized-crime statute. We hold that it is.

## I. FACTS AND PROCEDURAL BACKGROUND.

Caton Jones and Salena Anderson were Detroit, Michigan, residents with a get-rich-quick plan. The plan involved driving to Lexington, Kentucky, and employing homeless men to sign up for two-year cell-phone service contracts with no intent to make payments in order to obtain high-end international smartphones at discounted rates. A particular Blackberry phone with

international service was very popular on the secondary market and could be purchased at a greatly discounted rate from service providers if the purchaser agrees to a two-year service contract. Jones and Anderson would pay each homeless person $20 for his efforts and resell the activated phones on the secondary market to a great monetary windfall.

Lexington Police Department Detective Kevin Duane received a phone call from the loss-prevention manager at an area Best Buy that a homeless man was attempting to purchase a cell phone. Detective Duane went to the store and approached the homeless man, ultimately convincing him not to purchase the phone. He followed the man outside the store and observed him speaking to another man in a van. Detective Duane approached the man in the van and learned he was from Detroit; the man eventually explained to the detective the entire scheme. The Michigan man believed he was simply exploiting a loophole in the law. For whatever reason, Detective Duane did not take him in for questioning.

Over the course of the next several months, the Lexington Police Department received reports from a number of cell-phone retailers that the homeless cell-phone scam continued. But each time law enforcement arrived at the store, the men (and the van) had already left. Later, Detective Duane finally apprehended one of the phone purchasers. After reading the man his *Miranda* rights, the man informed him he was a resident of a local homeless shelter and he was recruited by people in a van offering each resident $20 for every cell phone purchased. To be sure, the man had purchased several cell phones (and contracts) that day. And he admitted to Detective Duane that he had no intention of honoring the two-year service contract he signed at each location.

2

Detective Duane then followed the man outside the store to the van in the parking lot. Around the same time, Jones was returning to the van from a similar cell-phone retailer nearby. Detective Duane also found Anderson and a number of other men sitting in the back of the van. Jones was very cooperative with Detective Duane, and fully explained the situation. After obtaining consent to search the van, he also discovered several cell phones, a handwritten budget detailing the entire operation, and receipts for phones and service contracts purchased by twelve different people. Jones and Anderson were then taken to police headquarters and Jones provided a recorded statement after receiving his *Miranda* warnings. Detective Duane then seized all of their equipment and cell phones, leaving them just enough cash to return to Detroit.

Jones and Anderson were charged with one count of "Engaging in Organized Crime: Criminal Syndicate by managing, supervising, and/or directing individuals to acquire retail merchandise including cell phones, by deception and/or fraud, with the intent to resell it." Detective Duane admitted that though the homeless men could certainly be charged under the organized crime statute as well, he intentionally chose not to penalize them "so he could sleep at night." Jones appeared in court and knowingly and voluntarily waived his right to counsel. He presented no evidence in his defense at trial, and the jury found him guilty. The jury fixed his punishment at the statutory-minimum five years' imprisonment.[1]

---

[1] Anderson never appeared for trial; a warrant was issued but her charges were dismissed without prejudice following Jones's conviction.

Jones filed two post-trial motions with the trial court seeking a new trial and, alternatively, seeking to probate his sentence. The trial court denied a new trial but agreed to probate his sentence. He was accordingly sentenced to the minimal five-year sentence, probated for five years. Jones then appealed the judgment to the Kentucky Court of Appeals, contending that he was entitled to a directed verdict. The panel majority agreed and reversed his conviction, concluding that there was insufficient evidence to prove he and his conspirators collaborated under the "continuing basis" necessary to sustain an organized-crime conviction.

We granted discretionary review to determine whether the Commonwealth presented sufficient evidence for a jury to conclude beyond a reasonable doubt that Jones engaged in a continuing criminal operation. Reviewing the plain meaning of the statute's text, today we hold that Jones was not entitled to a directed verdict. We accordingly reverse the Court of Appeals' decision and reinstate the trial court's judgment.

## II. ANALYSIS.

### A. Standard of Review

For its first and only claim of error, the Commonwealth insists Jones was not entitled to a directed verdict because the Commonwealth sufficiently proved he was leading a continued criminal collaboration. At the close of the Commonwealth's evidence, Jones moved the trial court for directed verdict on the ground that he had not committed a crime. The trial court denied his motion. To be sure, the Due Process Clause of the Fourteenth Amendment certainly "protects the accused against conviction except upon proof beyond a

4

reasonable doubt of every fact necessary to constitute the crime with which he is charged."[2] Our standard of review for denial of a directed verdict is whether, under the evidence as a whole, it would be clearly unreasonable for the jury to find Jones guilty.[3] We construe all evidence below in a light most favorable to the Commonwealth.[4]

## B. Jones was not Entitled to a Directed Verdict.

The Kentucky Penal Code offers a broad description of precisely what activity is subject to criminal liability for participation in organized crime. Kentucky Revised Statutes (KRS) 506.120 establishes nine classes of activities for which a "person, with the purpose to establish or maintain a criminal syndicate or to facilitate any of its activities" may be subject to prosecution.[5] Of these nine activities, six are potentially applicable to this case:

1. Organize or participate in a criminal syndicate or any of its activities.[6]
2. Provide material aid to a criminal syndicate or any of its activities, whether such aid is in the form of money or other property, or credit.[7]
3. Manage, supervise, or direct any of the activities of a criminal syndicate, at any level of responsibility.[8]
4. Commit, or conspire or attempt to commit, or act as an accomplice in the commission of, any offense of a type in which a criminal syndicate engages on a continuing basis.[9]
5. Commit, or conspire or attempt to commit, or act as an accomplice in the commission of more than one (1) theft

---

[2] *In re Winship*, 397 U.S. 358, 364 (1970).

[3] *See Commonwealth v. Fletcher*, 59 S.W.3d 920, 921 (Ky. 2001).

[4] *See Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 1991).

[5] KRS 506.120(1).

[6] KRS 506.120(1)(a).

[7] KRS 506.120(1)(b).

[8] KRS 506.120(1)(c).

[9] KRS 506.120(1)(e).

of retail merchandise with intent to resell the merchandise.[10]

   6. Acquire stolen retail merchandise for the purpose of reselling it where the person knew or should have known that the merchandise had been stolen.[11]

Specifically, Jones was indicted for "managing, supervising and/or directing numerous other individuals to acquire retail merchandise including cell phones, by deception and/or fraud, with the intent to resell it." The indictment most closely resembles the retail-merchandise-theft component of the statute, though it also appears to incorporate Jones's culpability as the leader and organizer of the scheme. Instructions to the jury provide more clarity. It is unmistakable that the Commonwealth prosecuted Jones under a theory that he engaged in a criminal syndicate to commit retail-merchandise theft with the intent to resell the stolen merchandise.

There is no doubt that Jones organized, managed, and participated in the scheme, he is the architect of the plan. But the most critical question in determining Jones's criminal liability is whether his plan may be properly labeled a "criminal syndicate." In fact, Jones denies any criminality in his actions; rather, he contends he simply took advantage of the laws and exploited a loophole, as any successful entrepreneur would. The statute offers tremendous assistance in this inquiry. A criminal syndicate is defined as either "five (5) or more persons, or, *in cases of merchandise theft* from a retail store for the purpose of reselling the stolen merchandise, two (2) or more persons,

---

[10] KRS 506.120(1)(h).

[11] KRS 506.120(1)(i).

6

collaborating to promote or engage"[12] the commission of "any theft offense as defined by KRS Chapter 514."[13]

So in conducting our directed-verdict review, there are four elemental conclusions that based on the evidence presented at trial a reasonable jury must be able to reach beyond a reasonable doubt: (1) that a "theft" occurred in furtherance of Jones's scheme; (2) that two or more persons were involved; (3) that the persons collaborated in furtherance of the plan; and (4) that the scheme operated on a continuing basis.

### 1. A theft occurred.

The threshold issue we must address is whether sufficient evidence was presented at trial for the jury reasonably to conclude Jones's scheme was a "theft." Though the statute's definition of "criminal syndicate" includes any theft offense in KRS Chapter 514, the jury in this case was instructed on a theory that Jones and his minions acquired the cell phones by deception—an allegation Jones strongly denies. Instead, Jones suggests the phones were legally purchased and he bears no liability from the homeless mens' failures to perform on their two-year service contracts.

Under Kentucky law, a person is guilty of theft by deception if "the person obtains property or services of another by deception with intent to deprive the person thereof."[14] The statute further defines "deceive," in relevant part, as intentionally "creat[ing] or reinforce[ing] a false impression, including

---

[12] KRS 506.120(3)(emphasis added).

[13] KRS 506.120(3)(c).

[14] KRS 514.040(1).

false impressions as to law, value, intention, or other state of mind."[15] So under the Commonwealth's theory of the case, theft by deception occurred when Jones's homeless enlistees obtained the phones by signing a service contract they had no intention of honoring. The Commonwealth presented testimony from some of the homeless men verifying that they had no intention of complying with the terms of the various service contracts they signed.

Jones rebuts the Commonwealth's theory primarily by denying that the phones were unlawfully obtained. He argues that they were legally purchased merchandise at the time of his arrest. The Commonwealth rebutted this allegation with testimony from cell-phone company employees explaining precisely how scams like Jones's affect their businesses. The employees explained to the jury that the companies subsidize part of the cost of the phone in exchange for a two-year service contract and the remaining cost of the phone is recouped over the course of payment. Individual sales operatives work for base pay plus commission. If someone cancels the service contract or does not pay during the first 90 days of service, the lost money is taken from the employee's paycheck. Moreover, employees testified that they believed that they may be sued for discrimination if they refuse to sell devices to suspicious-looking people. So the testimony adequately informed the jury that by purchasing a phone and service contract with no intention to honor the contract Jones and his team "deprived" these businesses in an immediate and quantifiable manner.

---

[15] KRS 514.040(1)(a).

But Jones counters this testimony in two ways. He first defends the legality of his activities by criticizing the phone companies' business models. To him, there was no deprivation of property from the companies—they only made a foolish business decision. Fortunately, Chapter 514 includes a robust definition of *deprive* as applied to theft-related offenses. Under the Kentucky Penal Code, *deprive* means either "[t[o withhold property of another permanently or for so extended a period as to appropriate a major portion of its economic value or with intent to restore only upon payment of reward or other compensation,"[16] or to "dispose of the property so as to make it unlikely that the owner will ever recover it."[17] To us, a reasonable jury could conclude that either definition could apply: Jones intended permanently to withhold the remaining portion of the subsidized cost of the phone.

Second, Jones suggests that his plan narrowly invokes a loophole in the theft-by-deception statute. Specifically, he contends the provision declaring that "deception as to a person's intention to perform a promise shall not be inferred from the fact alone that he did not subsequently perform the promise" categorically exculpates any potential theft offense relating to the service contracts. But invoking this provision as a defense is logically fallacious; the provision only stands for the proposition that failure to pay *alone* is not enough to establish theft-by-deception. In the immediate case, the Commonwealth presented ample testimony from Jones's associates affirmatively establishing *intent to deceive*. Reliance on this provision as a complete defense is misplaced, and it is certainly not enough to entitle Jones to a directed verdict.

---

[16] KRS 514.010(1)(a).

[17] KRS 514.010(1)(b).

There was sufficient evidence for a reasonable jury to find a theft occurred.

## 2. *There were more than two participants.*

For our next inquiry, we must determine whether statutorily required number of participants was involved in this scheme to qualify as a criminal syndicate. As referenced above, the statute mandates either five or more participants, or, in the case of retail-merchandise theft, two or more participants.[18] The Commonwealth charged Jones on the latter qualification, and the instructions to the jury reflected that theory. In addition to Salena Anderson, the Commonwealth identified at least a dozen homeless participants. And some of them testified at trial. It is undisputed that the plan was executed by a cadre of homeless men. So we can conclude that a reasonable jury could find that the cell-phone scam was conducted by a group of two or more participants.

## 3. *The group collaborated in furtherance of the scheme.*

The next element to establishing the existence of a criminal syndicate is a requirement that participants "collaborated" to engage in theft by deception. We have previously held that proof of collaboration does not require a showing "that each participant in the criminal scheme collaborated with or was aware of the collaboration of the other participants."[19] Similarly, "collaboration in the statute means simply collaborating in the scheme, and it is not necessary for the Commonwealth to show that each participant collaborating in the scheme collaborated with or even was aware of the collaboration of the other

---

[18] *See* KRS 506.120(3).

[19] *Edmonds v. Commonwealth*, 906 S.W.2d 343, 348 (Ky. 1995).

10

participants."[20] So to us, the collaborating element is satisfied if the Commonwealth can establish enough evidence of two or more participants with general knowledge of the scheme to acquire fraudulently the international cell phones. And we conclude the Commonwealth met this burden.

First and foremost, evidence of Anderson's involvement should be enough to establish collaboration. From the facts presented in this case, it would appear that Jones and Anderson are co-architects; at the very least Anderson could be aptly described as an accomplice to Jones's plan with full knowledge of what they hoped to achieve. Under the loose understanding of collaboration that we have previously articulated, proof of Anderson's involvement should be sufficient to take the charge to the jury. Anderson was not prominently featured in the Commonwealth's proof, but her involvement was at least referenced throughout the trial.

Even if we exclude Anderson from our calculus, the Commonwealth's evidence of the homeless participants' complicity in the plan meets the evidentiary burden as well. When Detective Duane received consent to search Jones's van, he found receipts for two-year service contracts in the name of a dozen different homeless men. And some of those men testified at Jones's trial about their roles in the scheme—that Jones would give them $20 for each phone they obtained by signing a service contract. This general understanding that Jones asked them to acquire a cell phone by creating a false impression is sufficient to us for a reasonable jury to determine two or more persons collaborated to effectuate Jones's theft-by-deception plan.

---

[20] *Commonwealth v. Phillips*, 655 S.W.2d 6, 9 (Ky. 1983).

11

### 4. *The group collaborated on a continuing basis.*

The final and most contentious inquiry in determining whether Jones's plan can be characterized as a criminal syndicate is whether the plan was intended to operate on a continuing basis. The Court of Appeals majority, in reversing Jones's convictions, held that he was not guilty of operating a criminal syndicate because there was insufficient evidence that he collaborated on a continuing basis with the participants testifying at trial. The panel majority's ruling misstates our prior interpretations of the statute's command.

In support of its decision reversing Jones's conviction, the Court of Appeals majority relied on our recent holding in *Parker v. Commonwealth.*[21] And to be sure, we vigorously interpreted Kentucky's organized-crime statute in its most paradigmatic application—gang-related violence and drug trafficking. In *Parker*, we reversed a criminal defendant's criminal syndicate conviction because the Commonwealth provided insufficient evidence to prove he collaborated with four or more persons[22] on a continuing basis dealing drugs as part of his association with the Crips gang. But there are critical discrepancies in the present case that are distinct from *Parker.*

In *Parker*, we held that there was insufficient evidence of a continuing basis because the Commonwealth's case centered on a "singular drug deal that resulted in Barnes' death."[23] The Court of Appeals majority reached a similar result in this case, taking issue that most of the Commonwealth's evidence

---

[21] 291 S.W.3d 647 (Ky. 2009).

[22] *Id.* Because Parker was not indicted under a merchandise-theft theory, his case was reviewed under the standard criminal-syndicate definition. So the Commonwealth needed to prove five or more collaborators, rather than merely two or more necessary for guilt in Jones's case.

[23]*Id.* at 675.

zeroed-in on Jones's activity on one particular day. But in *Parker*, we also reaffirmed that "[t]he Commonwealth is not held to proving any specific number of incidents or any element of time, but must show by the proof what the jury could infer from the evidence as intent to collaborate on a continuing basis."[24] Unlike *Parker*, where the evidence focused on one drug deal, the Commonwealth in this case presented evidence of multiple purchases in a single day, repeated criminal acts. Some homeless participants testified to going to multiple stores in one day. And Jones made multiple trips to Lexington to effectuate his plan. The Commonwealth did enough to ensure the jury knew of far more than one instance in furtherance of the scheme, which *Parker* strongly condemns as insufficient proof of a continuing basis.

We also refused to find a continuous collaboration in *Parker* because one witness testified that "every man did their own thing."[25] Though the Commonwealth in *Parker* pursued a criminal-syndicate theory premised on drug trafficking, witness testimony stated that "the Crips made their own deals and sold their own drugs."[26] But such autonomy is unquestionably lacking in this case. Though it is true each participant went into each store alone and signed every contract individually, it is equally true he did so at Jones's behest. Jones drove all of the men to each store, directed which store to enter, told them which phone and plan to purchase, and compensated each man that successfully returned with the international smartphone. It is clear from the

_____

[24] *Id.* (quoting *Phillips*, 655 S.W.2d at 9.).

[25] *Id.* at 676.

[26] *Id.*

13

Commonwealth's proof that each participant in Jones's scheme did not, in contrast to *Parker*, "do their own thing."

And finally, as part of its continuing-basis analysis, the Court of Appeals spent considerable time discussing whether Jones intended to continue his scheme into the future. But this is an unnecessary inquiry.[27] Even if we willingly suspend disbelief that Jones did not know he was perpetuating theft and that after learning of the unlawful nature of his operation he would abandon his business, there remains ample evidence that he was conducting this collaboration on a continuing basis at the time of his arrest. At minimum, the Commonwealth presented enough evidence to allow reasonable jurors to decide for themselves.

### 5. *Jones intended to form a criminal syndicate.*

Much of the difficulty in this case is derived from the unconventional nature of this factual application to Kentucky's organized-crime statute. But as a reviewing body interpreting a statute, it is our duty to give effect to the plain meaning of the statute's text. And "a person's mistaken belief that his conduct, as a matter of law, does not constitute an offense does not relieve him of criminal liability."[28] So it is immaterial to our analysis whether Jones subjectively knew he was forming a criminal syndicate. The sole guiding factor is whether the Commonwealth produced enough evidence to show that the text encompasses his actions. And we hold the Commonwealth met this burden.

---

[27] *See Hill v. Commonwealth*, 125 S.W.3d 221, 231 (Ky. 2004) (evidence that a criminal scheme to smuggle marijuana into prison lasted for two to five months was sufficient to support finding a criminal syndicate operating on a "continuing basis" despite testimony that a participant planned to "get out").

[28] KRS 501.070(3).

14

We have no doubt that Jones is no Mafioso. But the text crafted by the legislature and signed into law by the governor covers more than the gangland imagery synonymous with organized crime. The statute plainly criminalizes organized efforts to engage in merchandise theft. And Jones created such an organization whether he subjectively classified it as criminal or not.

## III.   CONCLUSION.

For the foregoing reasons, we reverse the Court of Appeals' decision and reinstate the trial court's judgment.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Andy Beshear
Attorney General of Kentucky

Christian Kenneth Ray Miller
Assistant Attorney General of Kentucky

COUNSEL FOR APPELLEE:

Willie Edward Peale Jr.
Peale Law Office