# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C), THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE ACTION.

RENDERED:  FEBRUARY 16, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0477-MR

BILLY CLARK, III                                                                   APPELLANT


V.                          ON APPEAL FROM BUTLER CIRCUIT COURT
                            HONORABLE TIMOTHY COLEMAN, JUDGE
                                      NO. 20-CR-00007


COMMONWEALTH OF KENTUCKY                                            APPELLEE


### MEMORANDUM OPINION OF THE COURT

### <u>AFFIRMING</u>

This case comes before the Court on appeal as a matter of right[1] by Billy Clark, the Appellant, from the judgment and sentence of the Butler Circuit Court. After a jury trial, Clark was convicted of first-degree rape (victim under twelve); first-degree sodomy (victim under twelve); two counts of sexual abuse in the first degree; and use of a minor in a sexual performance.[2] The jury then found him guilty of being a persistent felony offender in the first degree. He was sentenced to fifty years in prison and now appeals. For the following reasons, we affirm.

---

[1] Ky. Const. § 110(2)(b).

[2] Clark had also been charged with kidnapping, but the trial court had granted a directed verdict in favor of Clark on that charge.

## I.     Facts

In July 2014, the victim, M.R., lived with her mother at Roger Garner's house.[3] M.R. was eight years old. Her mother was a drug user, and Garner's house was frequented by other drug users who would stay at the house for random periods of time. At this time, Billy Clark used Garner's house to hideout as he was wanted by law enforcement in connection with a stolen hearse.

Approximately five years later in July 2019, M.R. was thirteen years old and living with her grandmother. M.R. ran away and stayed with a friend for a couple of days. During this time M.R. first disclosed to her friend that she had been sexually assaulted in July 2014. After that, M.R. told her grandmother, and the latter told M.R.'s father. M.R.'s father reported the assault to the police.

State Trooper Carlock was the initial lead investigator of the case and he scheduled M.R. for an interview with Dr. Patricia Faulkner-Simmons at the Barron River Child Advocacy Center. State Trooper Edwards eventually took over as lead investigator. He showed a 2018 photo of Billy Clark to M.R. who, seeing the photo, identified Clark as her assailant. M.R. also testified that she remembered the assault taking place when a hearse was on Garner's property and a man was staying there who was on the run from the police.

M.R. testified as to the details of the assault. Her mother had gone to the store, and M.R. was in a bedroom folding laundry. Clark entered the bedroom

---

[3] We use initials to protect the privacy of the victim.

and she tried to leave. She testified that Clark brought a knife and gun with him into the room but did not use them in the assault. M.R. attempted to leave but Clark grabbed her arm and pulled her back into the room. He then instructed her to remove her clothing and had her walk around the room. He then forced her to bend over on the bed, where he touched various parts of her body and held her by the wrists, threatening her with violence if she told anyone about what was happening. Clark then put on a condom and M.R. testified that her vagina hurt "really bad" for a number of minutes. Afterward, Clark instructed M.R. to sit up and compelled her to remove the condom from his penis. Although she did not identify the substance, M.R. testified something was in the condom, presumably semen. Clark next instructed M.R. to put another condom on his penis and forced her to perform oral sex. After that was over, Clark noticed M.R. was bleeding and told her to go take a shower. He also once again threatened to hurt her and her mother if she told anyone what happened.

Dr. Faulkner-Simmons testified that M.R. was born with an abnormally webbed vagina which would have made sexual intercourse painful for M.R. Dr. Faulkner-Simmons indicated that this condition would have prevented full penetration, but her examination of M.R. after five years could not discount whether an attempt at penetration had been made. Additionally, she testified any wounds stemming from the assault would have been healed by the time of her examination. In short, there is no medical evidence confirming or disproving M.R.'s account.

3

Dr. Faulkner-Simmons testified about a statement M.R. made, which Clark challenges as inadmissible hearsay. First, Dr. Faulkner-Simmons read from her report summarizing M.R.'s statements during her interview of her, that

> she did disclose to me as well that she was sexually abused by an individual, um, and she described, where she was, who some of the people that were there. Uh, she also named the individual that she said abused her, um, and she said that he actually had a knife and a gun and showed them to her. And, um, she was told, excuse me, told not to tell anyone . . .

This testimony was objected to at trial in regard to referencing the knife and gun, hence preserved. Later, Dr. Faulkner-Simmons testified,

> I forgot to mention that when he came in, he had turned all the lights off in the room where she was. He also had her to put his penis in her mouth, and then from there, she kind of closed down and said she had blocked out all the other details and couldn't remember anymore. Which is not an unusual occurrence.

This last statement was not objected to at trial hence the alleged error is unpreserved.

Finally, there is one instance during *voir dire* that is subject to appeal. Clark moved the trial court to strike Jurors 18 and 19 for cause. These motions were denied, forcing him to use peremptory challenges which he would have used on Jurors 32 and 3, and these jurors were identified to the trial court on the strike sheet prior to seating the jury. Juror 32 was excused because 16 jurors had already been selected thus mooting any challenge to Juror 18. But Juror 3 sat on the jury, serving as foreperson. Because Juror 3 did sit on the jury, we review for error as to Juror 19 since Clark's preservation of this issue comports with *Neal v. Floyd*, 590 S.W.3d 245, 252 (Ky. 2019). *See also Gabbard v.*

4

*Commonwealth*, 297 S.W.3d 844, 854 (Ky. 2009) (holding that failure to strike a juror for cause "can be shown to be non-prejudicial if the other jurors the defendant would have used his peremptory strikes on do not actually sit on the jury.").

As for Juror 19, he was a former coroner in Ohio County and had previously served as a witness in a case which the lead prosecutor in this case had also prosecuted. It was the prosecutor who brought this to the attention of the Court. Juror 19 was brought to the bench and informed the Court he did not remember the prosecutor and would not be preferential to the Commonwealth if selected as a juror.

Clark argues the trial court committed error by: refusing to strike Jurors 18 and 19 for cause, as noted, however, the challenge to Juror 18 is mooted because Juror 32 did not sit on the jury; allowing Dr. Faulkner-Simmons' hearsay statements; prohibiting Clark's attorney from questioning M.R. regarding her knowledge of her uncle's alleged rape and sodomy charges; and failing to direct a verdict on the charge for rape, as M.R. never specifically testified to vaginal penetration by Clark and Dr. Faulkner-Simmons' stated that in her medical opinion M.R. was not penetrated vaginally by Clark. We now address the merits and further facts will be developed as necessary.

## II.     Analysis

### A. No Abuse in Refusal to Strike Juror 19

"When there is reasonable ground to believe that a prospective juror cannot render a fair and impartial verdict on the evidence, that juror shall be excused

5

as not qualified." RCr[4] 9.36. We have held time and again that partiality is a state of mind and not a technical question, thus "the test is whether the nature and strength of the opinion formed are such as in law necessarily . . . raise the presumption of partiality." *Gabbard*, 297 S.W.3d at 854 (quoting *Montgomery v. Commonwealth*, 819 S.W.2d 713, 717 (Ky. 1991)). This requires the trial court to "weigh the probability of bias or prejudice based on the entirety of the juror's responses and demeanor[,]" as well as "the credibility of the juror's answers." *Jackson v. Commonwealth*, 392 S.W.3d 907, 913 (Ky. 2013). We have also emphasized that there is no such thing as rehabilitation. *Gabbard, supra*, at 853-54. Where a juror has made statements evincing a reasonable ground to believe he or she is partial the juror ought to be disqualified, and neither the Commonwealth, defense, nor the trial court may subject the juror in question to a colloquy in hopes of salvaging that juror. Indeed, even where a juror's partiality is in a "gray area, he should be stricken." *Wallace v. Commonwealth*, 478 S.W.3d 291, 298 (Ky. 2015).

As for Juror 19, the sole basis advanced for his disqualification is that he was a coroner in an adjacent county and had previously been a witness in a rape and murder case that the prosecutor in this case had also prosecuted. Clark cites no statements during voir dire by Juror 19 that could be construed as giving a reasonable basis for partiality to the Commonwealth. We reject his citation to *Futrell v. Commonwealth*, 471 S.W.3d 258, 274 (Ky. 2015) as

---

[4] Kentucky Rules of Criminal Procedure.

distinguishable. In that case, the juror with a previous relationship to the assistant prosecutor had stated

> When asked during the prosecutor's *voir dire* whether his relationship with attorney Tobbe would "cause you to automatically give the Commonwealth's case or witnesses more weight than you would anything else?" Juror 75 replied, "I think so." The prosecutor then asked whether Juror 75's relationship with attorney Tobbe would make it difficult for the juror to vote to acquit the defendants even if he felt the Commonwealth had failed to prove its case, and Juror 75 responded, "I really can't answer that. I'm trying to be honest with you."

*Id.* at 273. No similar responses occurred here, and the *Futrell* court obviously found partiality for Juror 75 based on his responses and not merely his connection to the assistant prosecutor alone. The other juror that should have been disqualified for his relationship to the assistant prosecutor was based on his son being a current client of the attorney. *Id.* at 274. But this Court noted other reasons existed to disqualify that juror as well. *Id.* at 275.

In *Fugate v. Commonwealth*, we held the trial court should have disqualified two jurors for cause because they had a previous relationship with the prosecutor. 993 S.W.2d 931, 938 (Ky. 1999). One had had a living will and incorporation papers for a business prepared by the prosecutor five years prior to trial. *Id.* He expressed his satisfaction with the work and stated he might seek his services in the future. The second was involved with the prosecutor because of a bad check criminal case that was pending at the time of voir dire. The juror and prosecutor had apparently gotten close enough to be on a first name basis. *Id.* at 939. This Court explicitly endorsed the rule that "a trial court is required to disqualify for cause prospective jurors who had a prior

7

professional relationship with a prosecuting attorney and who profess that they would seek such a relationship in the future." *Id.* at 938.

*Fugate* is distinguishable because Juror 19 was not professionally involved with the prosecutor in the same manner as in *Fugate.* In *Fugate,* both jurors had a relationship with the prosecutor in which they had a personal interest at stake—one had a will and business incorporation papers filed on his behalf, and the other had a criminal case pending wherein his business was the victim. Here, the only relationship between Juror 19 and the prosecutor was brought about by their mutual professional obligations where Juror 19 had to testify as coroner in a murder case. Indeed, Juror 19 denied recognizing the prosecutor despite that. Additionally, Clark has argued that Juror 19 should be considered a member of law enforcement. But we have held that even police officers should not be disqualified merely because they are police officers, and thus work with the Commonwealth Attorney's office in a professional capacity. *Brown v. Commonwealth,* 313 S.W.3d 577, 597 (Ky. 2010). Because we find *Fugate* distinguishable, and there being no statement identified by Clark that could lead to a reasonable basis of partiality, we find no abuse of discretion by the trial court in declining to strike him for cause.

### B. Harmless Error in Dr. Faulkner-Simmons' Hearsay Statements

The Kentucky Rules of Evidence provide an exception to hearsay for medical treatment when the "[s]tatements [are] made for purposes of medical treatment or diagnosis and describing medical history . . ." KRE 803(4). The Commonwealth concedes the hearsay in this case. Dr. Faulkner-Simmons'

mention of the gun and knife had no relation to her medical treatment or diagnosis since there was no evidence the gun and knife were used to inflict a physical injury upon M.R. or that they had caused her some kind of emotional trauma. As to her statement that it was not an "unusual occurrence" when M.R. described blocking out memories of her assault, that too is generally prohibited because it is testimony as to a "habit of a class of individuals[,]" *Sanderson v. Commonwealth*, 291 S.W.3d 610, 613 (Ky. 2009) (quoting *Kurtz v. Commonwealth*, 172 S.W.3d 409, 414 (Ky. 2005)), intending "to prove that the person was a member of that class *because* he/she acted the same way under similar circumstances." *Id. Sanderson* gives an adequate review of this Court's jurisprudence demonstrating our distrust of testimony which tends to invade the province of the jury by finding criminal conduct based on a psychological syndrome of a victim. *Id.* at 612-14.

But "[n]o error . . . is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order unless it appears to the court that the denial of such relief would be inconsistent with substantial justice." RCr 9.24. Regarding Dr. Faulkner-Simmons' statement about the gun and knife, the error was harmless. The Commonwealth correctly notes that defense counsel did not ask for the statement to be stricken from the record nor for an admonition to the jury to disregard it. She only asked that the doctor's testimony be kept within proper bounds regarding medical treatment and diagnosis. The rest of her testimony conformed (with one exception that was not objected to at trial, discussed

below) to that request despite the trial court overruling her motion. Technically speaking, the trial court ought to have sustained the objection but substantively Clark "received all the relief he requested . . . thus, there is no error to review." *Johnson v. Commonwealth*, 105 S.W.3d 430, 441 (Ky. 2003).

As to the "not an unusual occurrence" statement, being an unpreserved objection, our review is for palpable error. "A palpable error must be so grave in nature that if it were uncorrected, it would seriously affect the fairness of the proceedings." *Brewer v. Commonwealth*, 206 S.W.3d 343, 349 (Ky. 2006). Only if the reviewing court is convinced "the result in the case would have been different without the error[,]" will palpable error be found. *Id.* In *King v. Commonwealth*, we held that it was not palpable error when a police investigator testified that "delayed reporting" was not unusual in child sexual abuse cases, and in fact it was "very rare" for children to immediately report such abuse. 472 S.W.3d 523, 527 (Ky. 2015). Although the testimony here was qualitatively different, relating to M.R.'s blocked memory of the assault rather than the five-year delay in reporting, both fundamentally involve typical behavior of a victim of sexual abuse. But in like manner as in *King*, the testimony here did not result in a manifest injustice. The testimony in *King* was much more extensive than the one-off sentence expressed, unprompted, by Dr. Faulkner-Simmons here. The Commonwealth did not pursue an improper line of inquiry afterwards but rather moved Dr. Faulkner-Simmons' testimony along to the concrete, physical facts of M.R.'s case. We are not convinced the result in

10

this case would have been different but for Dr. Faulkner-Simmons' one short statement.

### C. Right to Cross-Examination was not Infringed

Clark also contends that his right to cross-examination was violated when the trial court precluded him from asking M.R. about how she acquired knowledge regarding the sexual acts she described as being perpetrated by Clark. In other words, Clark alleges that M.R. had previously heard familial discussions regarding her uncle who also had been charged with rape and sodomy prior to her first reporting the assault. Clark contends that it was her knowledge of these charges against her uncle that allowed M.R. to concoct the allegations against him. Moreover, Clark implies in his briefing that M.R. made up the story of an assault to avoid getting in trouble for running away; and her knowledge of her uncle's alleged rape and sodomy charges was relevant to that alternate theory. We note that while the trial court prohibited questions regarding her uncle, it did say Clark could cross examine M.R. regarding her alleged motivation to accuse him of rape in order to avoid getting in trouble for running away.

In *Basham v. Commonwealth*, we held the constitutional right to cross examination "does not give criminal defendants a right to present evidence that is not probative, nor does it authorize a fishing expedition at trial." 455 S.W.3d 415, 420 (Ky. 2014). Basham had sought to cross examine the victim regarding her visiting pornographic websites in order to provide evidence that she "was previously exposed to the sort of sexual acts that she described in her

11

allegations of abuse." *Id.* at 419. This has come to be known as the "sexual innocence inference." "[B]ecause most children of tender years are ignorant of matters relating to sexual conduct, a child complainant's ability to describe such conduct may persuade the jury that the charged conduct in fact occurred." *Id.* at 418 n.7 (quoting *Grant v. Demskie,* 75 F.Supp.2d 201, 213–16 (S.D.N.Y. 1999)). Basham, however, had only sought to ask the victim if she had ever visited a website with naked people on it. Consequently, we held "merely seeing images of naked people" was not an adequate alternate source of knowledge for the sexual acts alleged in that case, thus the offer of proof was neither probative nor relevant and therefore inadmissible. *Id.* at 420.

Although Clark has not alleged the jury would have inferred from M.R.'s age alone that her knowledge of sexual acts could only be explained by her experiencing them because of Clark's assault, the underlying rationale of *Basham* is still applicable. Like in *Basham,* Clark's offer of proof lacks the requisite specificity for the Court to say it was relevant. There is nothing in the record to demonstrate M.R.'s uncle's alleged rape and sodomy were in anywise similar to what she claims to have undergone, nor is there any avowal testimony that she overheard any family discussions regarding her uncle's alleged actions. The line of questioning was irrelevant and inadmissible, and the trial court properly excluded it.

### D. No Error in Refusal to Direct a Verdict on Rape Charge

Finally, Clark argues the trial court should have directed a verdict in his favor on the rape charge because Dr. Faulkner-Simmons testified she did not

12

believe penetration occurred and M.R. never specifically testified to being

penetrated vaginally by Clark.

> The legal standards for a directed verdict motion are clear: 'if under the evidence as a whole it would not be clearly unreasonable for a jury to find the defendant guilty, he is not entitled to a directed verdict of acquittal.' *Trowel v. Commonwealth*, 550 S.W.2d 530, 533 (Ky. 1977). 'The trial court must draw all fair and reasonable inferences from the evidence in favor of the party opposing the motion, and a directed verdict should not be given unless the evidence is insufficient to sustain a conviction. The evidence presented must be accepted as true. The credibility and the weight to be given the testimony are questions for the jury exclusively.' *Commonwealth v. Sawhill*, 660 S.W.2d 3, 5 (Ky. 1983). The standard for appellate review is equally clear: 'on appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal.' *Commonwealth v. Benham*, 816 S.W.2d 186, 187 (Ky. 1991).

*Eversole v. Commonwealth*, 600 S.W.3d 209, 217-18 (Ky. 2020). "We construe

all evidence below in a light most favorable to the Commonwealth."

*Commonwealth v. Jones*, 497 S.W.3d 222, 225 (Ky. 2016).

Our analysis depends first and foremost on the statute. First-degree rape

occurs when one "engages in sexual intercourse with another person" by

forcible compulsion or the victim is either physically helpless or is twelve years

or younger. KRS[5] 510.040. "Sexual intercourse" has been defined by the

General Assembly as "its ordinary sense and includes penetration of the sex

organs of one person by any body part or a foreign object manipulated by

another person." KRS 510.010(8). Any penetration, "however slight[,]" is all that

---

[5] Kentucky Revised Statutes.

is required to meet the element of the crime. *Id.* Because the legislature has also defined "deviate sexual intercourse" to mean "any act of sexual gratification involving the sex organs of one person and the mouth or anus of another[,]" rape in the first degree of a female is necessarily limited to penetration of her vagina. KRS 510.010(1).

The peculiarity of this case arises from M.R.'s vaginal abnormality. Because of this abnormality, Dr. Faulkner-Simmons did state "I do not believe she had a penis penetrating her vaginal area." But that is one, isolated sentence and does not accurately convey the whole of her testimony. Dr. Faulkner-Simmons described M.R.'s abnormality as "The vaginal opening wasn't a normal one-hole opening. It was webbed, if you will, and had multiple openings because there was tissue that criss—you know, crossed over from each side." Because of this she also stated, "If there was a potential for penetration, it probably would not have gone through, but it would have been painful." Thus, the Commonwealth asked "Could the penis have penetrated the vagina, just not fully?" To which she responded unequivocally "Right. Correct." It is therefore incorrect to describe Dr. Faulkner-Simmons' opinion as no penetration whatsoever occurred. She admitted an attempt at penetration could have occurred and that it could have been less than full penetration, i.e., "however slight." But we have already detailed that the physical medical evidence was lacking to confirm any kind of penetration, so the case depended upon M.R.'s own testimony.[6]

---

[6] "The testimony of a single witness is enough to support a conviction." *King, supra*, at 526.

M.R.'s testimony never included an explicit statement with the term

"penetration." But "[t]he fact of penetration may be proved by circumstances."

*Jones v. Commonwealth*, 833 S.W.2d 839, 841-42 (Ky. 1992). Moreover,

"[a] jury may make reasonable inferences from circumstantial evidence."

*Commonwealth v. James*, 586 S.W.3d 717, 721-22 (Ky. 2019). And as we have

just stated, on a motion for a directed verdict the trial court is required to make

all fair and reasonable inferences in favor of the Commonwealth, as well as

accepting M.R.'s account as true. *Eversole, supra.*

M.R. testified during Clark's attack that "I just looked down and something

hurt really, really bad." In another colloquy with the Commonwealth she again

stated,

> M.R.: "Something really, really bad hurt."
> Commonwealth: "What part of your body hurt?"
> M.R.: "My vagina."
> Commonwealth: "Was that before or after he put on the condom?"
> M.R.: "After."

Finally, she testified after the attack "I was bleeding and stuff . . . he told me to

go take a shower." Dr. Faulkner-Simmons testified that M.R.'s abnormality

would have made penetration painful, and common sense tells us that an

eight-year-old would have experienced pain upon being penetrated vaginally.

There is no logical explanation for the pain M.R. described if penetration did

not occur. M.R.'s testimony of bleeding after the attack also has no logical

explanation without penetration as there was no other testimony that he

otherwise beat her or cut her. We cannot say, viewing the evidence as a whole,

15

that it was unreasonable for a jury to find Clark had raped M.R. Dr. Faulkner-Simmons' testimony does not discount some kind of penetration occurring, and a juror could (in fact, did) make reasonable inferences from M.R.'s testimony that some kind of penetration of her vagina had occurred.

## III. Conclusion

For the aforementioned reasons, we affirm Clark's convictions.

All sitting. All concur.

COUNSEL FOR APPELLANT:

Aaron Reed Baker
Assistant Public Advocate
Department of Public Advocacy

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Mark D. Berry
Assistant Attorney General